## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE<br>1130 17th Street, N.W.<br>Washington, D.C. 20036 | ) ) ) ) | |
| AUDUBON OF KANSAS<br>210 Southwind Place<br>Manhattan, KS 66503-3184 | ) ) ) ) | **Case No.** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| THE HONORABLE LISA JACKSON<br>ADMINISTRATOR<br>U.S. Environmental Protection Agency<br>Ariel Rios Building<br>1200 Pennsylvania Ave., N.W. (1101A)<br>Washington, D.C. 20460 | ) ) ) ) ) ) ) | |
| UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY<br>Ariel Rios Building<br>1200 Pennsylvania Ave., N.W.<br>Washington, D.C. 20460 | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Defenders of Wildlife ("Defenders") and Audubon of Kansas ("Audubon"), by

and through their undersigned counsel, state and allege as follows:

### NATURE OF THIS CASE

1.     This case challenges the decisions of the U.S. Environmental Protection Agency

("EPA") to issue registrations for two rodenticides targeting black-tailed prairie dogs despite

known hazards to non-target wildlife in violation of the Endangered Species Act ("ESA"), 16

U.S.C. §§ 1531-1544, the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7

1

U.S.C. §§ 136-136y, the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703, the Bald and

Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. § 668a-d, and other federal laws and

regulations.

2.      Chlorophacinone and diphacinone, first generation anti-coagulants, cause death as a

result of internal and external bleeding.  Death is prolonged, often occurring over a period of one

or two weeks.  During that time, the poisoned prairie dogs may exhibit disorientation, weakness,

and behavioral modifications, making them easier targets for predators.  Multiple predators and

scavengers feed on live and dead prairie dogs, and the secondary toxicity of chlorophacinone and

diphacinone is often lethal to these species.

3.      On May 13, 2009, EPA approved the use of Rozol Prairie Dog Bait (containing

chlorophacinone) to target black-tailed prairie dogs in eleven Midwestern states.  Over the past

several years, EPA has also approved several state-issued Special Local Needs registrations for

the use of Kaput-D (containing diphacinone) to target prairie dogs.

4.      Multiple U.S. Fish and Wildlife Service ("FWS") offices have submitted comments

and letters to EPA urging that registrations of chlorophacinone and diphacinone be disapproved

or rescinded because of known and potential impacts to wildlife.  FWS specifically requested

that EPA enter into formal consultation pursuant to Section 7 of the ESA because the range of

the black-tailed prairie dog overlaps with the black-footed ferret, one of the most critically

endangered mammals in the United States.  According to FWS, use of these rodenticides in these

states could damage ferret recovery efforts and impact other federally-protected species

including the endangered whooping crane and American burrowing beetle.  In addition,

numerous birds and raptors protected by the MBTA and BGEPA, including burrowing owls,

bald and golden eagles, Swainson's hawks, ferruginous hawks, and turkey vultures, are known to

2

be at risk from the use of these chemicals. The target of these rodenticides, the black-tailed

prairie dog, is itself a species of conservation concern that has been extirpated from 98 percent of

its historic range. FWS recently released a positive 90-day finding on a petition to add the black-

tailed prairie dog to the list of federally endangered or threatened species. FWS, 90-Day Finding

on a Petition To List the Black-tailed Prairie Dog as Threatened or Endangered 73 Fed. Reg.

73,211 (Dec. 2, 2008)

5.      EPA has not engaged in consultation with FWS as required by the ESA regarding the

use of Rozol or Kaput-D since 1993, at which time the chemicals were not approved for field use

on prairie dogs. EPA has refused repeated requests by FWS to reinitiate consultation for these

registrations.

6.      EPA registered and approved the use of these rodenticides under FIFRA despite

FWS's warnings of widespread concerns about the products' toxicity to non-target wildlife.

Information obtained under a Freedom of Information Act request suggests that EPA's own

Environmental Fate and Effects Division ("EFED") made specific recommendations to reduce

potential impacts to non-target wildlife prior to the approval of the Rozol registration, but these

safeguards were inexplicably omitted from the final label out of deference to the pesticide's

manufacturer. Furthermore, EPA did not provide the public with any notice or opportunity to

comment during the registration process for Rozol, as is required by FIFRA.

7.      EPA has since failed to disapprove, suspend, or cancel these registrations, pursuant to

its oversight responsibilities, despite requests to do so by plaintiffs, FWS, and the Western

Association of State Fish & Wildlife Agencies, among others.

8.      Plaintiffs Defenders and Audubon notified EPA of these violations pursuant to the 60-

day notice provisions of the ESA, 16 U.S.C. § 1540(g), on July 15, 2009, and now commence

this action.  Plaintiffs seek a judgment declaring that EPA's actions regarding the registrations of

Rozol Prairie Dog Bait (containing chlorophacinone) and Kaput-D Prairie Dog Bait (containing

diphacinone) violate multiple federal laws, and respectfully request an injunction ordering EPA

to vacate the registrations.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction pursuant to 16 U.S.C. § 1540(c), 7 U.S.C. § 136n, and 28

U.S.C. §§ 1331, 1361, and 2201, as this action presents cases and controversies under the

Endangered Species Act, 16 U.S.C. §§ 1531-1544, the Federal Insecticide, Fungicide and

Rodenticide Act, 7 U.S.C. §§ 136-136y, the Migratory Bird Treaty Act, 16 U.S.C. § 703, the

Bald and Golden Eagle Protection Act, 16 U.S.C. § 668(a)-(d), and the Administrative Procedure

Act, 5 U.S.C. §§ 553-559, 701-706.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because this is a civil

action against an agency of the United States and is filed in a judicial district in which the

Defendants, and some of the Plaintiffs, reside.

11.    The Declaratory Judgment Act grants this Court authority to enter a declaratory

judgment as a final order.  28 U.S.C. § 2201(a).

## THE PARTIES

12.    Defenders of Wildlife is a national, non-profit organization dedicated to the protection

and restoration of America's wildlife and habitats.  Defenders is headquartered in Washington,

District of Columbia, with offices throughout the United States, including states in which Rozol

Prairie Dog Bait and Kaput-D are approved for use to control prairie dogs.  Defenders has more

than 550,000 members, many of whom reside in the eleven states affected by these agency

actions. Defenders is committed to protecting imperiled wildlife from threats to their survival and recovery, one of which includes the use of harmful pesticides.

13.     Defenders and its members monitor and aggressively advocate for the conservation of species and their habitat. Defenders routinely submits public comments in response to proposed EPA decisions which may impact imperiled wildlife. Defenders also regularly publishes, for use of its members, information regarding wildlife in the states impacted by this agency action. The aesthetic, recreational, professional, and organizational interests of Defenders, its members, staff, and officers are impaired by EPA's decision to register Rozol and Kaput-D despite the significant potential impact to non-target and imperiled wildlife.

14.     Audubon of Kansas is a statewide, not-for-profit organization established to promote appreciation and stewardship of Kansas' natural ecosystems, with special emphasis on conservation of prairies, birds, other wildlife and their habitat. A grassroots organization made up of more than 5,000 members, Audubon is governed by a Board of Trustees consisting of leaders from each of the Audubon chapters in Kansas and other dedicated conservation leaders who share a common interest in implementing Audubon's goals and mission statement. Audubon submitted lengthy comments to EPA detailing concerns about the widespread use of Rozol throughout the Great Plains and warning of the likelihood of secondary poisoning of eagles, hawks, swift foxes, badgers, coyotes, and black-footed ferrets. The aesthetic, recreational, professional, and organizational interests of Audubon's members, staff, and officers are impaired by EPA's decision to register Rozol and Kaput-D without due regard to impacts on imperiled wildlife.

15.     Plaintiffs bring this action on their own institutional behalf and on behalf of their members. Plaintiffs' membership includes individuals who enjoy studying and observing

wildlife in their natural habitat. Plaintiffs' members have been directly involved in prairie dog conservation, monitoring, and relocation work. Plaintiffs' staff and members also derive benefits from watching and working with birds and wildlife that may suffer secondary poisoning as a result of the expanded use of Rozol and Kaput-D. Specifically, staff and members have also participated in efforts to recover the critically-endangered black-footed ferret and other species that FWS indicates are at risk due to Rozol and Kaput-D. The enjoyment of these benefits by plaintiffs' members will be harmed by EPA's approval of these rodenticide registrations, in violation of its statutory obligations, that unreasonably threaten numerous raptors, mammals, and other wildlife.

16.     Defenders, Audubon, and their members have an interest in requiring EPA to follow its statutory mandates under FIFRA, the ESA, and other environmental laws in a manner that protects the environment from unsafe and unreasonable exposure to rodenticides and which allows for full public participation in decisions related to the registration of these compounds. EPA's failure to provide for notice and comment prior to approving applications for chlorophacinone for use against black-tailed prairie dogs deprived plaintiffs of a right of public participation to which they are entitled under the law.

17.     The interests of plaintiffs in obtaining and disseminating information regarding pesticide use and impacts on wildlife, endangered and threatened species and their habitats, have been harmed by defendants' actions. EPA's actions also require plaintiffs to expend more of their limited organizational resources on efforts to conserve such species throughout their range than would otherwise have been in the case.

18.     Defendant Lisa Jackson, is Administrator of EPA, and is sued in her official capacity.

19.    Defendant EPA, a federal agency of the United States, is responsible for the implementation and administration of the relevant provisions of FIFRA.

20.    The requested declaratory and injunctive relief mandating that EPA comply with its statutory obligations would redress plaintiffs' injuries.

## STATUTORY FRAMEWORK

21.    FIFRA and its implementing regulations prohibit the distribution or sale of pesticide products that are not registered in accordance with FIFRA.  7 U.S.C. § 136a; 40 C.F.R. § 152.15. A pesticide product is defined as a "a pesticide in the particular form (including composition, packaging, and labeling) in which the pesticide is, or is intended to be, distributed or sold." 40 C.F.R. § 152.3.

22.    Applicants wishing to register a new pesticide product are required to file an application with EPA containing certain information about the pesticide.  7 U.S.C. § 136a(c); 40 C.F.R. § 152.42.

23.    FIFRA requires EPA to promptly publish a notice of each application for registration of a pesticide if it contains any new active ingredient or would entail a changed use pattern.  The notice must provide for a thirty day public comment period.  7 U.S.C. § 136a(c)(4).

24.    EPA regulations require publication in the Federal Register of notice of receipt of each application for registration of a product that contains a new active ingredient or that proposes a new use.  40 C.F.R. § 152.102.  A new use is defined as including "[a]ny aquatic, terrestrial, outdoor, or forestry use pattern, if no product containing the active ingredient is currently registered for that use pattern; [a]ny additional use pattern that would result in a significant increase in the level of exposure, or a change in the route of exposure, to the active ingredient of

man or other organisms." *Id.* § 152.3.  EPA must accept comments on the notice of application.
*Id.* § 152.102.

25.    If the product is registered, regulations require the publication of a notice of issuance
in the Federal Register, which should include response to comments received.  40 C.F.R. §
152.102.

26.    EPA may not register a pesticide unless "(C) it will perform its intended function
without unreasonable adverse effects on the environment" and "(D) when used in accordance
with widespread and commonly recognized practice it will not generally cause unreasonable
adverse effects on the environment."  7 U.S.C. § 136a(c)(5).  "Unreasonable adverse effects on
the environment" is defined under FIFRA as "any unreasonable risk to man or the environment,
taking into account the economic, social, and environmental costs and benefits of the use of any
pesticide."  7 U.S.C. § 136(bb).

27.    FIFRA also allows states to register additional uses of already federally registered
pesticides for distribution solely within that state to meet special local needs.  7 U.S.C. §
136v(c).  "Special local need" is defined as "an existing or imminent pest problem within a State
for which the State lead agency, based upon satisfactory supporting information, has determined
that an appropriate federally registered pesticide product is not sufficiently available."  40 C.F.R.
§ 162.151.

28.    A registration issued pursuant to this section has the same effect as a FIFRA federal
registration for all purposes of FIFRA other than the restriction on its use within the state.  7
U.S.C. § 136v(c).  This includes FIFRA provisions for suspension and cancellation.  40 C.F.R. §
162.152(c).  Pursuant to FIFRA, EPA may cancel a pesticide registration if it causes

unreasonable adverse effects on the environment, or suspend a pesticide registration if necessary to prevent an imminent hazard.  7 U.S.C. §136d.

29.    Prior to approving a registration, the state must determine that there is a special local need for the product and that the use of the product will not cause unreasonable adverse effects on man or the environment when used in accordance with labeling directions or widespread and commonly recognized practices.  40 C.F.R. § 162.153.

30.    EPA may disapprove, "on any reasonable grounds," any state registration which does not have both a similar composition and a similar use pattern as a federally registered pesticide product if it finds a probable creation of unreasonable adverse effects on man or the environment.  EPA may disapprove any state registration if it determines the use of the product under state registration would constitute an imminent hazard.  7 U.S.C. § 136v; C.F.R. § 162.154.  Imminent hazard is defined as existing when the continued use a pesticide "would be likely to result in unreasonable adverse effects on the environment or will involve unreasonable hazard to the survival of a species declared endangered or threatened" pursuant to the ESA.  7 U.S.C. § 136(l).

31.    The ESA requires all federal agencies, in consultation with the Secretary of Commerce or Interior, to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species."  16 U.S.C. § 1536(a)(1).

32.    The ESA requires all federal agencies undertaking an agency action to insure through consultation with the Secretary of Commerce or Interior that the action is "not likely to jeopardize the continued existence of any endangered species or threatened species."  16 U.S.C. § 1536(a)(2).

33.   Joint regulations require EPA to engage in consultation as to all listed species that may be affected by a FIFRA action. 50 C.F.R. § 402.42. A FIFRA action is an action by EPA to "approve, permit or authorize the sale, distribution or use of a pesticide under sections 136-136y of [FIFRA]." 50 C.F.R. § 402.40.

34.   The Migratory Bird Treaty Act extends protection to "any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof," which is covered by four migratory bird treaties listed in 16 U.S.C. § 703 and which is "native to the United States or its territories." 16 U.S.C. § 703.

35.   The MBTA declares that "[u]nless and except as permitted by regulations made as hereinafter provided, it shall be unlawful at any time, by any means or in any manner, to . . . take, . . . kill, attempt to take . . . or kill . . . any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof." 16 U.S.C. § 703.

36.   In support of the MBTA, President William J. Clinton issued Executive Order 13186, entitled "Responsibilities of Federal Agencies to Protect Migratory Birds," on January 17, 2001. It states that "Migratory birds [are] of great ecological and economic value to this country." It "directs executive departments and agencies to take certain actions to further implement" the Migratory Bird Treaty Act. Specifically, it provides that "[e]ach Federal agency taking actions that have, or are likely to have, a measurable negative effect on migratory bird populations is directed to develop and implement, within 2 years, a Memorandum of Understanding (MOU) with the Fish and Wildlife Service (Service) that shall promote the conservation of migratory bird populations." It further provides that "each agency shall . . . support the conservation intent

of the migratory bird conventions by . . . avoiding or minimizing , to the extent practicable,

adverse impacts on migratory bird resources when conducting agency actions, . . . restore and

enhance the habitat of migratory birds . . . ." According to recent FWS correspondence, EPA has

failed to implement such a memorandum of understanding with FWS within the required time,

still has not implemented one, and is now in violation of Executive Order 13186.

37.     The Bald and Golden Eagle Protection Act likewise prohibits anyone, without a permit

issued by the Secretary of the Interior, from "taking" bald or golden eagles, including their parts,

nests, or eggs.  The Act defines "take" as "pursue, shoot, shoot at, poison, wound, kill, capture,

trap, collect, molest or disturb." 16 U.S.C. § 668c.  Mortality from secondary poisoning due to

Rozol application in prairie dog towns has been documented in a badger collected in Kansas in

2006 and a bald eagle collected in Nebraska in 2007.  Additional carcasses have been collected

in and around areas treated with chorophacinone and diphacinone and are awaiting testing.  FWS

believes that "only a small percentage of animals that die from secondary poisoning are ever

located" and that violations of MBTA and BGEPA "may be occurring via use of these products."

## THE CHALLENGED AGENCY ACTIONS

**Rozol Prairie Dog Bait**

38.     On May 13, 2009, EPA issued a notice of conditional registration—EPA Registration

No. 7173-286—for Rozol Prairie Dog Bait, pursuant to Section 3 of FIFRA.  7 U.S.C. §

136a(c)(7)(A).  The active ingredient of the product is chlorophacinone, at a concentration of

0.005%.  The label authorizes the underground application of the product to control black-tailed

prairie dogs in eleven states: Arizona, Colorado, Kansas, Montana, Nebraska, New Mexico,

North Dakota, Oklahoma, South Dakota, Texas and Wyoming.

39.     EPA did not publish the application to register chlorophacinone in the Federal Register or elsewhere.  EPA did not solicit public comment on the application prior to registering chlorophacinone.

40.     EPA did not publish a notice of issuance for its registration of chlorophacinone in the Federal Register.  To date, inexplicably, the label is not available on EPA's online Pesticide Product Label System ("PPLS").

41.     EPA did not make an express safety determination that chlorophacinone used as prairie dog bait would not cause unreasonable adverse effects on the environment.

42.     To the extent EPA did determine that this use would have no unreasonable adverse effects on the environment, its determination was based on insufficient scientific evidence in light of the following: 1) recommendations from its own Environmental Fate and Effects Division to mitigate adverse environmental effects by requiring increased carcass retrieval and eliminating use in Arizona (where black-tailed prairie dogs are not located), neither of which were ultimately included on the label; 2) recommendations to not approve chlorophacinone for field use from the Wyoming Field Office of FWS; 3) recommendations to disapprove a special local needs registration for Rozol use in Nebraska from the Mountain-Prairie Region of FWS; 4) reports of incidents of secondary harms to raptors protected by the MBTA and BGEPA; 5) an incident in South Dakota involving illegal use of Rozol on the Rosebud Reservation which left several hundred dead and dying black-tailed prairie dogs above ground.

43.     Likewise, EPA's decision to omit from the label the recommendations of its Environmental Fate and Effects Division to mitigate adverse environmental effects was arbitrary and capricious.

44.     Prior to its approval of chlorophacinone for use against black-tailed prairie dogs, EPA did not engage in required consultation actions with FWS as required by § 7(a)(2) of the ESA and did not utilize its authorities in furtherance of the ESA as required by §7(a)(1).  FWS has not reviewed chlorophacinone since a 1993 programmatic Biological Opinion, which did not consider field use of cholorphacinone on prairie dogs or potential impacts of expanded use of the chemical on black-footed ferrets, which feed primarily on prairie dogs.  See 73 Fed. Reg. 73,211. The black-tailed prairie dog's range also overlaps with the whooping crane and American burying beetle, which are also listed under the ESA.  EPA has never consulted with FWS on the impacts of this expanded use of cholorphacinone on these or other listed species.

### Kaput-D Prairie Dog Bait

45.     Use of Kaput-D Prairie Dog Bait has been authorized by state special local needs ("SLN")  registrations pursuant to FIFRA § 24 in Kansas, Nebraska, Wyoming, Texas, and Colorado.

46.     EPA has not exercised its authority to disapprove the registrations if the use of the pesticide product will have unreasonable adverse effects on the environment, despite: 1) EPA's own finding in its 2004 comparative ecological risk assessment that diphacinone has a greater secondary risk to non-target species than chlorophacinone; 2) the recommendations of the Nebraska Game and Parks Commission and FWS Mountain-Prairie Region to disapprove the registration because of secondary toxicity concerns; 3) additional warnings from FWS of impacts to threatened and endangered species and migratory birds.

47.     EPA has not exercised its authority to suspend or cancel SLN registrations despite evidence of unreasonable environmental impacts nor has it required state labels to conform to the recommendations of its own scientists.

48.    EPA has never engaged in formal consultation with FWS regarding use of diphacinone to target prairie dogs as required by § 7(a)(2) of the ESA despite the agency's statement that additional consultation may be necessary if any new uses of these pesticides are proposed (EPA 1998, p. 109). FWS believes the use of this chemical constitutes a new use because neither poison was registered for field use on prairie dogs at the time of the 1993 Biological Opinion. 73 Fed. Reg. 73211. In its 1993 opinion, however, FWS did find that diphacinone use on rodents in the vicinity of black-footed ferrets was likely to jeopardize the survival of the species. EPA has never consulted with FWS on the impacts of this expanded use of diphacinone on whooping cranes, American burying beetles or other listed species.

49.    EPA exercised inadequate oversight of state local needs registrations for diphacinone despite §7(a)(1) of the ESA, which requires all federal agencies to utilize their authorities in furtherance of the ESA.

### FIRST CLAIM FOR RELIEF

50.    Plaintiffs repeat the allegations of the preceding paragraphs as if set forth in full.

51.    EPA's registration of Rozol Prairie Dog Bait without engaging in consultation with FWS constitutes agency action not in accordance with law in violation of the APA, 5 U.S.C. §§ 702, 704, and 706(2)(A), ESA, §§ 7(a)(1), 7(a)(2), and ESA implementing regulations, 50 C.F.R. §§ 402.40, 402.42.

### SECOND CLAIM FOR RELIEF

52.    Plaintiffs repeat the allegations of the preceding paragraphs as if set forth in full.

53.    EPA's registration of Rozol Prairie Dog Bait without public notice and comment constitutes agency action not in accordance with law in violation of the APA, 5 U.S.C. §§ 702, 704, and 706(2)(A), FIFRA, § 136a(c)(4), and EPA's FIFRA regulations, 40 C.F.R. § 152.3.

### THIRD CLAIM FOR RELIEF

54.    Plaintiffs repeat the allegations of the preceding paragraphs as if set forth in full.

55.    EPA's registration of Rozol Prairie Dog Bait without publishing the required "notice of issuance" constitutes agency action not in accordance with law in violation of the 5 U.S.C. §§ 702, 704, and 706(2)(A), and EPA's FIFRA regulations, 40 C.F.R. § 152.102.

### FOURTH CLAIM FOR RELIEF

56.    Plaintiffs repeat the allegations of the preceding paragraphs as if set forth in full.

57.    EPA's registration of Rozol Prairie Dog Bait without making the safety finding required by law, and in the alternative, by making the finding that Rozol use would not produce unreasonable adverse effects on the environment despite lack of sufficient scientific evidence to support the decision, constitutes agency action not in accordance with law in violation of the APA, 5 U.S.C. §§ 702, 704, and 706(2)(A), and FIFRA, §§ 136a(c)(5).  Likewise, EPA's approval of a label for Rozol that did not include measures recommended by its experts to limit secondary poisoning of wildlife is arbitrary, capricious, and contrary to law.

### FIFTH CLAIM FOR RELIEF

58.    Plaintiffs repeat the allegations of the preceding paragraphs as if set forth in full.

59.    EPA's failures to reject state Special Local Need registrations of Kaput-D Prairie Dog Bait and to exercise oversight of the states' determinations that the product would have no unreasonable effects on the environment constitute agency actions not in accordance with law in violation of the APA, 5 U.S.C. §§ 702, 704, and 706(2)(A), FIFRA,  § 136v, and EPA's FIFRA regulations, 40 C.F.R. § 162.154.

60.    In the alternative, EPA's failure to exercise its authority to cancel or suspend state SLN registrations of Kaput-D Prairie Dog Bait constitutes agency action not in accordance with

law in violation of the APA, 5 U.S.C. §§ 702, 704, and 706(2)(A), FIFRA, §§ 136d, 136v(c), and

EPA's FIFRA regulations, 40 C.F.R. § 162.152(c).

## SIXTH CLAIM FOR RELIEF

61.    Plaintiffs repeat the allegations of the preceding paragraphs as if set forth in full.

62.    EPA's decision to not disapprove, suspend, or cancel state SLN registrations of Kaput-

D Prairie Dog Bait without engaging in consultation with FWS constitutes agency action not in

accordance with law in violation of the APA, 5 U.S.C. §§ 702, 704, and 706(2)(A), ESA, §§

7(a)(1), 7(a)(2), and ESA implementing regulations, 50 C.F.R. §§ 402.40, 402.42.

## SEVENTH CLAIM FOR RELIEF

63.    Plaintiffs repeat the allegations of the preceding paragraphs as if set forth in full.

64.    EPA's actions in registering Rozol Prairie Dog Bait and Kaput-D are violations of the

Migratory Bird Treaty Act, 16 U.S.C. § 703, Executive Order No. 13186, Responsibility of

Federal Agencies to Protect Migratory Birds, 66 Fed. Reg. 11 (2001), and the Bald and Golden

Eagle Protection Act, 16 U.S.C. § 668a-d, as species protected under these authorities have and

will likely be taken as a result of the use of these rodenticides in the affected states.  EPA's

failure to enter into a memorandum of understanding with FWS on protection of migratory birds

is a violation of Executive Order No. 13186.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that this Court enter judgment against Lisa

Jackson, Administrator of EPA and EPA as follows:

A.    An order declaring that EPA's May 2009 registration of Rozol Prairie Dog Bait

for use in eleven states is not in accordance with the law, pursuant to FIFRA, 7 U.S.C. §§

136a(c)(4), 136a(c)(5), and 136(bb), the ESA, 16 U.S.C. §§ 1536(a)(1), 1536(a)(2), the MBTA,

16 U.S.C. § 703, BGEPA, 16 U.S.C. § 668a-d, the APA, 5 U.S.C. § 706(2)(A), and federal

regulations, 40 C.F.R. §§ 152.102, 152.3, 50 C.F.R. §§ 402.40, 402.42, as set forth above;

     B.    An order declaring that state special local needs registrations of Kaput-D Prairie

Dog Bait are not in accordance with law, pursuant to FIFRA, 7 U.S.C. §§ 136d, 136v, the ESA,

16 U.S.C. §§ 1536(a)(1), 1536(a)(2), the MBTA, 16 U.S.C. § 703, BGEPA, 16 U.S.C. § 668(a)-

(d), the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and federal regulations, 40 C.F.R.

§§ 162.152(c), 162.154, 50 C.F.R. §§ 402.40, 402.42, as set forth above;

     C.    An order vacating the challenged pesticide registrations;

     D.    An order requiring EPA to engage in formal consultation with FWS as required

by Section 7 of the ESA prior to reissuing these registrations;

     E.    An order requiring EPA to enter into a memorandum of understanding with FWS

on protection of migratory birds in compliance with Executive Order No. 13186.

     F.    An order awarding plaintiffs their costs and reasonable attorneys' fees incurred in

connection with this dispute, as provided for under the ESA, 16 U.S.C. § 1540(g), the Equal

Access to Justice Act, 28 U.S.C. § 2412, and other applicable laws.

     G.    Any such other relief as the Court deems just and proper.

Dated this 23rd day of September 2009.

Respectfully submitted,

Jason C. Rylander, DC # 474995
jrylander@defenders.org
Michael P. Senatore, DC # 453116
msenatore@defenders.org
DEFENDERS OF WILDLIFE
1130 17th Street, N.W.

Washington, D.C. 20036
Phone: (202) 682-9400
Facsimile: (202) 682-1331

Attorneys for Plaintiffs Defenders of Wildlife and
Audubon of Kansas