# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**DEFENDERS OF WILDLIFE**, *et al.*,       )
                                        )
       **Plaintiffs,**               )
  **v.**                             )
                                        )
**LISA P. JACKSON**, *et al.*,             )
                                        )    **Civil Action No. 09-1814 (ESH)**
      **Defendants,**               )
                                        )
   **and**                           )
                                        )
**LIPHATECH, INC.,**                       )
                                        )
     **Defendant-Intervenor,**      )
_____)

## MEMORANDUM OPINION

The Defenders of Wildlife and Audubon of Kansas (collectively, "Defenders") and the Natural Resources Defense Council ("NRDC") have sued Lisa Jackson in her official capacity as the Administrator of the Environmental Protection Agency ("Agency"), alleging that the Agency violated the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), the Administrative Procedure Act ("APA"), and the Endangered Species Act ("ESA") by registering the rodenticide Rozol. (Defenders Compl. ¶¶ 50-57, 61-62.) The Defenders also allege that the Agency violated the Bald and Golden Eagle Protection Act ("Eagle Act"), the Migratory Bird Treaty Act ("Migratory Bird Act"), and Executive Order No. 13186.[1] (*Id.* ¶¶ 63-64.) LiphaTech, Inc., the manufacturer of Rozol, has intervened as a defendant. (Dkt. No. 7.) Plaintiffs filed a joint motion for summary judgment, while the Agency and LiphaTech filed separate cross-motions for

---

[1] The NRDC does not join in these claims. (Pls.' Mem. In Supp. of Pls.' Mot. for Summ. J. ["Pls.' Mot."] at 27 n.12.)

dismissal or, in the alternative, for summary judgment. (Dkt. Nos. 29, 33, 35.) For the reasons stated herein, the motions of all parties will be granted in part and denied in part.

## STATUTORY FRAMEWORK

### A. Endangered Species Act

The ESA, 16 U.S.C. § 1531 *et seq.*, has been called the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Babbitt v. Sweet Home Chapter of Cmties. for a Great Or.*, 515 U.S. 687, 698 (1995) (internal quotation marks omitted). Section 7(a)(2) of the ESA requires agencies to consult with the Fish and Wildlife Service ("FWS") to "insure that any action authorized, funded, or carried out" is "not likely to jeopardize the continued existence of an endangered species or threatened species or result in the destruction or adverse modification" of a listed species' critical habitat. 16 U.S.C. § 1536(a)(2). Agency regulations define "action" as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States." 50 C.F.R. § 402.02. "[J]eopardize the continued existence" means to "reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.* The Agency must review actions "at the earliest possible time." *Id.* § 402.14(a). If it determines that action will affect a listed species or critical habitat, it *must* engage in formal consultation with the FWS, unless one of several exceptions applies. *Id.* The FWS is required to produce a "biological opinion" that states whether the action will "jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat" and "[f]ormulate discretionary conservation recommendations" and a "statement concerning incidental take." 50 C.F.R. § 402.14(g).

Agency regulations also provide for an alternative "optional formal consultation procedure." *Id.* § 402.46. This provides an "additional" way for the Agency to "satisfy the requirements of section 7(a)(2) . . . for certain regulatory actions under FIFRA." *Id.* § 402.41. The Agency begins the consulting process by providing the FWS with a "written request," accompanied by an "effects determination," that lists information required under 50 C.F.R. § 402.14(c) and details the impact of the proposed action on the listed species or critical habitat. *Id.* §§ 402.40(b), 402.46. The Agency may include its own conclusions and "incidental take statement," which the FWS can adopt or reject. *Id.* § 402.46; *see also Wash. Toxics Coal. v. Dep't of Interior, Fish & Wildlife Serv.*, 457 F. Supp. 2d 1158, 1180 (W.D. Wash. 2006). If the FWS accepts these conclusions, the Agency's proposal is converted into the required "biological opinion and incidental take statement." *Wash. Toxics Coal.*, 457 F. Supp. 2d at 1180.

Consultation is "designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 603 (1992) (Blackmun, J., dissenting). Moreover, once consultation has begun under § 7(d), the "[f]ederal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not" jeopardize an endangered or threatened species or destroy its habitat. 16 U.S.C. § 1536(d). This "prohibition is in force" until the "requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09.

Private parties may enforce the ESA via a "citizen suit" provision that allows for "any person" to bring a civil suit to "enjoin any person, including . . . any other governmental instrumentality or agency . . . alleged to be in violation of any provision of this chapter . . . ." 16

U.S.C. § 1540(g)(1)(A). The Court has jurisdiction "to enforce any such provision or regulation." *Id.* § 1540(g)(1). However, no action "may be commenced" under § (g)(1)(A) "prior to sixty days after written notice of the violation has been given . . . ." *Id.* § 1540(g)(2)(A).

**B.      FIFRA**

FIFRA, 7 U.S.C. §§ 136-136y, requires pesticide manufacturers to register their products with the Agency before selling or distributing them. Registration under FIFRA is "product-specific" and defines the "terms and conditions under which the product can be legally distributed, sold, and used." *Reckitt Benckiser, Inc. v. EPA*, 613 F.3d 1131, 1133 (D.C. Cir. 2010). The Agency "shall register" a pesticide if it determines

> (A) its composition is such as to warrant the proposed claims for it; (B) its labeling and other material required to be submitted comply with the requirements of this subchapter; (C) it will perform its intended function without unreasonable adverse effects on the environment; and (D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

7 U.S.C. § 136a(c)(5). The Agency must publish notice of applications for registration "promptly" if the pesticide "contains any new active ingredient or if it would entail a changed use pattern." 7 U.S.C. § 136a(c)(4). The Agency must also publish "notice of receipt" in the Federal Register and must publish notice and respond to public comments when an application proposes a "new use." 40 C.F.R. § 152.102. A new use is one that would "result in a significant increase in the level of exposure, or a change in the route of exposure, to the active ingredient of man or other organisms." 40 C.F.R. § 152.3.

FIFRA also has a "conditional registration provision," which allows the Agency to "conditionally register or amend the registration of a pesticide if" it determines that the pesticide and proposed use are

(i) . . . substantially similar to any currently registered pesticide . . . or differ only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment, and (ii) approving the registration . . . would not significantly increase the risk of any unreasonable adverse effect on the environment.

7 U.S.C. § 136a(c)(7)(A).[2] Thus, the Agency may register a product even if the applicant is missing data that would otherwise be "required to obtain registration of a similar pesticide," so long as the applicants submit the data "not later than the time such data are required to be submitted with respect to similar pesticides already registered under this subchapter." *Id.*

FIFRA also allows states to register "additional uses" of "federally registered pesticides" to meet "special local needs," so long as registration for that use has "not previously been denied, disapproved, or canceled" by the Agency. 7 U.S.C. § 136v(c)(1). Though registration under this provision is "deemed registration under 136a," it only applies within the state issuing the registration. *Id.* The Agency may disapprove of a "local registration," and thereby render it ineffective, but must give the state advance warning and provide an opportunity to respond, unless it determines that the pesticide poses an "imminent hazard." *Id.* §§ 136v(c)(2)-(3).

A pesticide's registration must be "periodically reviewed," *id.* § 136a(g), and may be cancelled at any time by the Agency under § 136d(b) or by the registrant under § 136d(f)(1). *Reckitt Benckiser Inc.*, 613 F.3d at 1134. The Agency "may" issue a notice of intent to cancel a product's registration or to hold a hearing on cancellation when it "appears" that the pesticide or its labeling does not comply with FIFRA or "generally causes unreasonable adverse effects on the environment." *See id.* (citing 7 U.S.C. § 136d(b)). If the Agency refuses to cancel a registration, a party may obtain review of the decision in a district court. *Id.* (quoting 7 U.S.C. § 136n(a)). If the Agency simply issues notice of an intent to cancel and does not issue a notice of

---

[2] Conditional registrations have been referred to as "me-too" registrations because the products being registered must be "substantially similar to an already registered pesticide." *Syngenta Crop Prot., Inc. v. EPA*, 222 F.R.D. 271, 273 (M.D.N.C. 2004).

a hearing, the registrant may "demand" a hearing before an Administrative Law Judge, at which it may present testimonial and documentary evidence. 7 U.S.C. §§ 136d(b)(1), (d). Agency regulations also allow "any person adversely affected by a notice of the Administrator of his refusal to register or of his intent to cancel the registration or to change the classification of a pesticide" to request a hearing. 40 C.F.R. § 164.20(a). The same hearing is available when the Agency refuses to grant an application to register a pesticide. 7 U.S.C. § 136a(c)(6).

At a cancellation hearing, the "proponent of cancellation or change in classification" must present an "affirmative case for the cancellation or change in the classification of the registration." 40 C.F.R. § 164.80(a). At an application hearing, the "applicant shall have the burden of going forward." *Id.* However, "on all issues arising in connection with the hearing," whether related to cancellation or application, "the ultimate burden of persuasion shall rest with the proponent of the registration." *Id.* § 164.80(b); *see also Envtl. Def. Fund, Inc. v. EPA*, 510 F.2d 1292, 1302 (D.C. Cir. 1975) ("[t]he responsibility to demonstrate that the benefits outweigh the risks is upon the proponents of continued registration").

If a pesticide presents an "imminent hazard" and the Agency determines that "action is necessary . . . during the time required for cancellation or change in classification proceedings," the Agency may "suspend the registration of the pesticide immediately." 7 U.S.C. § 136d(c)(1). The Agency must generally issue a "notice of intention" to act before issuing a suspension order, and must include "findings pertaining to the question of 'imminent hazard'," to which the registrant may respond at an "expedited hearing." *Id.*

FIFRA channels cases into two separate pools for the purposes of judicial review. District courts have jurisdiction over "the refusal of [the EPA] to cancel or suspend a registration or to change a classification not following a hearing and other final actions of [the EPA] not

committed to the discretion of [the EPA] by law." 7 U.S.C. § 136n(a).  Courts of appeals have "exclusive jurisdiction" over challenges to the "validity of any order issued by the Administrator following a public hearing" made by "any person who will be adversely affected by such order and who had been a party to the proceedings."[3]  *Id.* § 136n(b).

## C. Migratory Bird Act And Eagle Act

The Migratory Bird Act, 16 U.S.C. § 703 *et seq.*, makes it "unlawful" to "pursue, hunt, take, capture, kill, attempt to take, capture, or kill" one of an enumerated list of birds protected under the Act.  *Id.* § 703(a).  The Eagle Act imposes criminal and civil penalties against anyone who takes bald and golden eagles without permission.  16 U.S.C. §§ 668a-b.  The Eagle Act defines "take," in part, as "poison, wound, [or] kill."  *Id.* § 668c.  Neither Act provides a framework for judicial review of agency actions.

## D. The Administrative Procedure Act

The APA gives a court jurisdiction over "[a]gency action made reviewable by statute and final agency action for which there is *no other adequate remedy* in a court."  *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005) (quoting 5 U.S.C. § 704)) (emphasis altered) (brackets in original).  The APA defines agency action as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).  A court must "hold unlawful and set aside agency actions, findings, and conclusions" that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  5 U.S.C. § 706(2).

---

[3] Courts have generally interpreted this to include Agency orders following public notice and comment. *See, e.g.*, *Humane Soc'y v. EPA*, 790 F.2d 106, 112 (D.C. Cir. 1986); *United Farm Workers v. Adm'r, EPA*, 592 F.3d 1080, 1082-83 (9th Cir. 2010).

### FACTS

The product at issue is Rozol, a rodenticide used on prairie dogs, and its active ingredient, chlorophacinone. In 1978, Congress passed a law requiring the Agency to "'reregister' all pesticides 'in the most expeditious manner practicable.'" *Reckitt Benckiser Inc.*, 613 F.3d at 1133 (quoting Act of Sept. 30, 1978, Pub. L. 95-396, § 8, 92 Stat. 819, 827 (1978)). In 1988, Congress enacted Section 4 of FIFRA, which details reregistration procedures for pesticides with active ingredients first registered before November 1, 1984. 7 U.S.C. § 136a-1(a). Chlorophacinone is one of these active ingredients. (*See* Administrative Record ["AR"] 81B at 2 (reregistration decision letter).)

In 1991, the Agency requested formal consultation with the FWS regarding a variety of previously registered chemicals, including chlorophacinone. (AR 81C at I-1.) Chlorophacinone, an "anticoagulant," progressively disrupts the body's blood-clotting ability over "an extended period of time." (AR 9 at 2.) The progressive worsening of symptoms causes affected animals to "exhibit weakness, disorientation," and other signs of illness. (*Id.*) In 1993, the FWS issued a Biological Opinion noting that some birds and mammals were "highly sensitive" to the chemical. (AR 81C at II-29.) The Agency determined that chlorophacinone was eligible for reregistration on September 30, 1997. (AR 81B, Letter from Lois A. Rossi.) At the time, twenty states had already locally registered the chemical for use against small ground mammals. (*Id.* at 6.) The Agency noted that it "presume[d] high risk to any small mammals that feed on chlorophacinone baits" and that rodents that had been poisoned with the chemical "pose[d] a risk to coyotes and presumably other species." (*Id.* at 89.) It added that "[a]dditional consultation with the Fish and Wildlife Service . . . may be necessary to determine if steps need to be taken to protect newly listed species . . . from proposed new uses of" chlorophacinone. (*Id.* at 109.) The Agency noted

that further studies of the effects of "[s]econdary [p]oisoning"[4] in mammals and birds were required.  (*Id.* at 111.)

On April 1, 2004,[5] the State of Kansas registered Rozol under FIFRA's special local need provision, with the stated purpose of controlling the prairie dog population.  (AR 3 at 1.)  Prairie dogs are "considered a public health pest" by the Agency because they can host fleas "that may vector plague."  (AR 7 at 2.)  Though Rozol was (and is) limited to use inside prairie dog burrows (AR 86 at 4), the disorientation and weakness caused by exposure can lead to poisoned animals "dying aboveground and being scavenged by other animals."  (AR 9 at 2.)  Moreover, animals exposed to the chemical take at least one week to die and sometimes survive more than two weeks.  (AR 82 at 4.)  There is also evidence that the chemical stays active within animals' bodies for twenty days or more.  (*Id.* at 7.)

The Agency approved this registration on July 30, 2004, although it required several changes to the product label to provide more precise instructions for use.  (AR 6 at 1.)  Nebraska and Wyoming approved Rozol for local use on black-tailed prairie dogs effective February 14 (AR 16 at 1) and May 23, 2006 (AR 29 at 1), respectively.  The FWS repeatedly expressed concerns about Rozol's effect on endangered and threatened species (*see* AR 9, AR 15, AR 30) and sent a letter to the Nebraska Department of Agriculture asking it not to "issue the 24(c) SLN registration for Rozol to control [prairie dogs] in Nebraska."  (AR 9 at 8.)  After Nebraska approved the registration, the FWS wrote to the Agency expressing "concerns regarding the use of Rozol" and "recommend[ing] that EPA disapprove the Rozol special local needs registration for Nebraska until important data gaps can be addressed."  (AR 15 at 1.)  The Agency approved

---

[4] This refers to poisoning caused by consuming smaller animals that had consumed the chemical.  (Pls.' Mot. at 5 n.2.)

[5] Although the Agency approval letter lists the Kansas approval date as April 1, 2001 (AR 6 at 1), it seems clear from the other attached documents that this is a typographical error, and it should be 2004.  (*See, e.g.*, AR 3 at 1.)

Nebraska's and Wyoming's registrations on November 16, 2006. (AR 17; AR 29 at 1.) Colorado approved Rozol for a special local need on November 1, 2006. (AR 33.) Texas did the same on April 27, 2007. (AR 46.) On July 30, 2007, Wyoming extended its special local need registration through July 30, 2012. (AR 53.) Oklahoma approved Rozol for a special local need registration on January 15, 2008. (AR 63.)

On January 23, 2008, LiphaTech asked the Agency to approve Rozol for use in all states where black-tailed prairie dogs live. In the section of the application form labeled "Explanation," LiphaTech stated that it was applying for "a new pesticide product (new use, non-food)," and that the action fell into "Fee Category R230."[6] (AR 70.) In an attached letter, LiphaTech also stated that it intended to "register a new pesticide," which was a "100% repackag[ing] of an existing registered product." (AR 71 at 1.) The application consolidated the existing special local needs registrations in Colorado, Kansas, Nebraska, Oklahoma, Texas, and Wyoming. (*Id.*) LiphaTech noted that it was applying for use in "states where black-tailed prairie dogs live, including several states that have not issued SLN labels for this use."[7] (*Id.* at 2.) LiphaTech wrote that the states that had "declined to issue SLN registrations" believed that FIFRA precluded such registration when zinc phosphide was available, and that these states "encouraged us to obtain regular" registration of Rozol "so that it can be registered and used in their states." (*Id.*) LiphaTech also promised to "request voluntary cancellation of all of these SLN registrations immediately following the issuance of" a general registration. (*Id.*)

The Agency conducted an internal risk assessment of LiphaTech's request in 2008. (AR 81.) The risk assessment said that it was "essential" that prairie dog carcasses be removed and

---

[6] According to the Agency, this "Action Code" is used to label actions that are "NEW USE; OUTDOOR; NON-FOOD." (AR 75.)

[7] These other four states were Montana, North Dakota, South Dakota and New Mexico. (AR 80 at 1.)

properly disposed of because predators could be indirectly poisoned by ingesting dead or dying prairie dogs.  (*Id.* at 2.)  It also said that a "special concern" was the effect of the poison on the Black-Footed Ferret — the "most endangered mammal in the United States."  (*Id.*)  These ferrets "[d]epend on" prairie dogs for food and prairie dog burrows for shelter.  (*Id.*)  Thus, the risk assessment concluded, Rozol would make "recolonization and recovery" of this ferret species "unlikely."  (*Id.*)  It also determined that Rozol posed a "likely" risk to "non-listed predators and scavengers."  (*Id.* at 9.)  The risk assessment also said that migratory birds, endangered species, and predators such as badgers, skunks, and coyotes could be exposed to Rozol.[8]  (*Id.* at 23.)

The Agency registered Rozol on May 13, 2009, with the conditions that LiphaTech voluntarily withdraw all local registrations and commit to conduct and submit a study of Rozol's effects on birds within three years.  (AR 86 at 1.)  The Agency admits that it did not consult with the FWS before approving the registration of Rozol.  (Answer ¶ 5.)  The Agency also failed to make a finding that Rozol would not have "unreasonable adverse effects on the environment." (Pls.' Mot. at 6; *see also* Defs.' Reply Mem. In Supp. of Cross-Mot. For Dismissal Or Summ. J. ["Defs.' Reply"] at 13 (acknowledging "lack of an express or detailed discussion of these issues").)  The Agency also concedes that it did not publish notice of the application in the *Federal Register* (Answer ¶ 39) and did not publish a notice that it had issued the registration. (*Id.* ¶ 40.)

On June 5, 2009, the World Wildlife Fund ("WWF") submitted a petition to the Agency requesting that it suspend its registration of Rozol.  74 Fed. Reg. 51601 (Oct. 7, 2009).  The petition asked the Agency to order LiphaTech to complete an "Avian Reproduction Survey," to formally consult with the FWS about Rozol, to create a "memorandum of understanding" with

---

[8] The risk assessment stated that buried Rozol could still be visible from the surface and that predators who dig could inadvertently uncover the Rozol pellets.  (AR 81 at 23.)

the FWS describing how the Agency would promote the "conservation of birds" under the Migratory Bird Treaty Act, and to prohibit the use of Rozol in any counties where black-footed ferrets were present.  *Id.*

On June 11, 2009, LiphaTech requested that its local registrations be cancelled.  (Defs.' Mot. at 8.)  On October 7, 2009, the Agency published notice of an opportunity for public comment on the WWF's petition to suspend or cancel Rozol's registration.  74 Fed. Reg. 51,601 (Oct. 7, 2009).

On September 30, 2010, the Agency began formally consulting with the FWS about Rozol's "potential effects to listed species and critical habitat nationwide."  (Pls.' Mot., Ex. 1, Decl. of Nathaniel Lawrence, Attach. D, at 1.)  The Agency asked the FWS to provide "location information relative to the species and the attributes of their various types of habitat" so that the Agency could better understand the "precise geographic scope of potential effects."  (*Id.* at 2.)  The Agency granted LiphaTech's request to cancel its local registrations effective October 14, 2010.  75 Fed. Reg. 63,178 (Oct. 14, 2010).  On November 16, the Agency issued its decision on the WWF petition.  (Defs.' Combined Opp. To Pls.' Mot. for Summ. J. and Cross-Mot. for Dismissal or Summ. J. ["Defs.' Mot."], Ex. D.)[9]  The Agency declined to cancel or suspend its registration for Rozol because of the existing "risk mitigation measures," the benefits of the product, the "pending consultation" with the FWS, and the "potential" for "further mitigation through voluntary label amendments."  (*Id.*)  No party has challenged this decision (LiphaTech's Reply at 19-20), and the time for appeal has apparently expired.  *See* 7 U.S.C. § 136n(a).

The Defenders filed a petition for review of the Agency's decision to register Rozol with the Circuit on July 10, 2009.  (Defs.' Mot. at 10.)  Five days later, they notified the Agency of its

---

[9] Although this document is not in the administrative record, the parties agree that the Court's reference to it in the context of analyzing the issue of mootness is proper.  (Pls.' Reply at 6 n.3.)

alleged violations pursuant to the sixty-day notice requirement of the ESA.  (Defenders Compl. ¶ 8.)  They filed suit here on September 23, 2009, alleging violations of the ESA, the APA, FIFRA, the Bald and Golden Eagle Protection Act, the Migratory Bird Treaty Act, and Executive Order 13186.[10]  (Pls.' Mot. at 8.)  LiphaTech, Inc., the manufacturer of Rozol, intervened as a defendant on January 8, 2010.  (Dkt. No. 7.)  The NRDC filed suit in June 2010, also alleging violations of the ESA, FIFRA, and the APA.  (Pls.' Mot. at 8.)  The Court consolidated the two cases on September 24, 2010.  (Dkt. No. 25.)  Plaintiffs moved for summary judgment on November 1 (Dkt. No. 29); the Agency filed a cross-motion for dismissal or summary judgment on December 8 (Dkt. No. 33), and LiphaTech filed a separate cross-motion for dismissal or summary judgment on December 16.  (Dkt. No. 35.)

**STANDARD OF REVIEW**

## I.    APA

The scope of review of a challenge to the Agency's actions under FIFRA is governed by the APA.  *See Defenders of Wildlife v. Adm'r, EPA*, 882 F.2d 1294, 1303 (8th Cir. 1989).  The same is true for plaintiffs' ESA claims, which are brought under the Act's citizen suit provision.[11]  16 U.S.C. § 1540(g)(1)(A); *Nat'l Ass'n of Home Builders*, 415 F.3d at 13 ("no statutory review provision in the ESA . . . authorizes judicial review of agency action beyond that provided for in the APA" and therefore the APA's standard of review applied); *Am. Forest Res. Council v. Hall*, 533 F. Supp. 2d 84, 89 (D.D.C. 2008) (court must determine if the

---

[10] The Defenders' initial complaint also contained allegations relating to the Agency's approval of local registrations for "Kaput-D," another type of pesticide that targets prairie dogs.  (Defenders Compl. ¶ 3.)  The Agency cancelled all special local needs registrations for Kaput-D because the registrant "failed to pay required fees to extend the registrations."  (Pls.' Notice of Voluntary Partial Dismissal at 1 [Dkt. No. 12].)  As a result, the parties agreed to dismiss all claims relating to Kaput-D on January 27, 2010.  (*Id.*)

[11] Although plaintiffs never explicitly state this, their Complaint asserts jurisdiction under § 1540(c) (Defenders Compl. ¶ 9) and seeks attorneys' fees under § 1540(g).  (*Id.* at 17.)  Nor do plaintiffs contest defendants' statement that their claim is brought under § 1540(g)(1)(A).  (*See* Defs.' Mot. at 12.)

Agency's action was "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law") (quoting 5 U.S.C. § 706(2)(A)).

The Court may reverse agency action under the APA "only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *United Techs. Corp. v. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)). "[T]he party challenging an agency's action . . . bears the burden of proof." *City of Olmstead Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) (citations omitted). The "arbitrary and capricious" standard is "'narrow, and a court is not to substitute its judgment for that of the agency.'" *United Techs. Corp.*, 601 F.3d at 562 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted). Nevertheless, agency actions will not be spared a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *United Techs. Corp.*, 601 F.3d at 562 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43). A counsel's "post hoc rationalizations" cannot substitute for an agency's failure to articulate a valid rationale in the first instance. *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1276 (D.C. Cir. 2005).

## II.   MOOTNESS

Defendants argue that the Court should dismiss plaintiffs' claims under the ESA and FIFRA because they are moot. (Defs.' Mot. at 2.) The "burden of demonstrating mootness is a heavy one." *Daingerfield Island Protective Soc'y v. Lujan*, 920 F.2d 32, 36 (D.C. Cir. 1990) (quoting *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). If plaintiffs' claims are moot,

the Court must dismiss the case for lack of jurisdiction "because [its] constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983). The case or controversy requirement "means that, throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). Thus, a case becomes moot when "'intervening events make it impossible to grant the prevailing party effective relief.'" *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (quoting *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996)). However, "even the availability of a partial remedy is sufficient to prevent a case from being moot." *Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999) (quoting *Calderon v. Moore*, 518 U.S. 149, 150 (1996)) (internal quotation marks omitted) (brackets omitted).

## ANALYSIS

## I. ENDANGERED SPECIES ACT

Plaintiffs seek both declaratory and injunctive relief under the ESA.[12] They both seek an order declaring that the Agency's registration of Rozol was not in accordance with the ESA because it failed to first consult with the FWS. (Defenders Compl. at 16-17; NRDC Compl. at 14.) Defenders also request an "order requiring EPA to engage in formal consultation with FWS . . . prior to reissuing these registrations." (Defenders Compl. at 17.) The NRDC requests slightly different injunctive relief: an order requiring the Agency to "engage in *and complete* formal consultation . . . prior to registering (or allowing registration of) Rozol . . . ." (NRDC Compl. at 14 (emphasis added).)

_____

[12] Both plaintiffs have brought their first Claim under the ESA. (Defenders' Compl. ¶¶ 50-51; NRDC Compl. for Declaratory & Injunctive Relief ["NRDC Compl."] at 8.)

### A.     Jurisdiction

#### 1.     Exclusive Jurisdiction In Court Of Appeals

LiphaTech argues in its Reply brief that jurisdiction over *any* claim under the ESA relating to the registration of Rozol rests solely with the Court of Appeals.  (LiphaTech Reply at 19.)  LiphaTech asserts that the Circuit has exclusive jurisdiction over the Agency's decision not to cancel its registration of Rozol because the Agency provided notice and opportunity for comment during the review process.  (*Id.*)  Thus, LiphaTech argues, because the cancellation decision is reviewable solely by the Circuit, any claims relating to it are also reviewable only by the Circuit.  (*Id.* (citing *Pesticide Action Network v. EPA*, No. C 08-1814, 2008 WL 5130405, at *6 (N.D. Cal. Dec. 5, 2008)))  From this, LiphaTech extrapolates that plaintiffs' *registration* claims cannot be brought in this Court because they relate to cancellation.  (LiphaTech Reply at 19-20.)  LiphaTech's argument fails, however, because registration and cancellation are distinct agency actions.  *Pesticide Action Network* suggests that when review of an agency's action is exclusively within the jurisdiction of a circuit court, plaintiffs cannot attempt to escape that jurisdiction by filing an ESA claim based on the same action.  *Pesticide Action Network*, 2008 WL 5130405 at *6.  But plaintiffs are not contesting the Agency's final decision on cancellation before either the Circuit or this Court.  Unlike the plaintiff in *Pesticide Action Network*, plaintiffs have only contested the registration of Rozol, which was done without notice and comment, and which, therefore, is not within the "exclusive jurisdiction" of the Circuit.  *See* 2008 WL 5130405, at *7.  Thus, LiphaTech's supporting citations are inapposite.

## 2. Mootness

The Agency does not suggest that it complied with the ESA.[13]  (*See* Defs.' Mot. at 31-37 ("acknowledg[ing] that a full evaluation of the potential risks to ESA-listed species is warranted").)  Nonetheless, the Agency argues that plaintiffs' claim under the ESA has been rendered moot because the Agency has, as of September 30, 2010 (a week after suit was filed here), begun formal consultation with the FWS pursuant to 50 C.F.R. § 402.46, and, therefore, the Court cannot grant effective relief.  (Defs.' Mot. at 32.)  Plaintiffs respond that the Agency remains in violation of the ESA until it finishes consulting with the FWS.  (Pls.' Reply at 10.)  Thus, they argue that the Court can provide an effective remedy by vacating the registration and ordering the Agency not to register Rozol without completing consultation.[14]  (*Id.*)

With respect to the Defenders' request in its Complaint for injunctive relief, it is moot because it would "accomplish nothing" for the Court to order the Agency to start consulting with the FWS when it has already begun to do so.  *See Larsen*, 525 F.3d at 4.  This result finds

---

[13] Undeterred, LiphaTech argues that the Agency was not required to consult with the FWS because the effect of registering Rozol was so insignificant that it did not trigger the ESA's obligation to consult.  (LiphaTech Mot. at 27.)  Although LiphaTech points out that plaintiffs have not responded to this specific argument (LiphaTech's Reply at 16 n.3), plaintiffs have not conceded this point because they responded in the context of their FIFRA argument, noting that the registration allowed the new use of Rozol on hundreds of thousands of acres of land.  (Pls.' Reply at 15-16 & n.11.)

LiphaTech's main support for its novel argument is that sales of Rozol in Montana, New Mexico, North Dakota and South Dakota have been "very limited."  (Liphatech Mot. at 27.)  The Court is presumably meant to infer that any demand for the product in those states is therefore likely to be insignificant.  (*Id.* at 15.)  However, LiphaTech's letter to the Agency, in which it wrote that those states that had "declined to issue SLN registrations" did so because they believed FIFRA precluded such registration when zinc phosphide was available, and "encouraged us to obtain regular" registration of Rozol "so that it can be registered and used in their states," flatly contradicts this argument.  (AR 71 at 2.)  Moreover, as plaintiffs observe, "current [Rozol] sales statistics prove nothing about where use is occurring, let alone where it will occur tomorrow."  (Pls.' Reply at 16 n.11.)

Given the Agency's failure to argue that it complied with the ESA, the fact that the Court would need to assume facts that are belied by the record (e.g., that there is no demand for Rozol in Montana, New Mexico, or the Dakotas), and given the precedent that LiphaTech's argument would set (e.g., that the Agency need not consult with the FWS about expanding the area where a pesticide may be used, so long as sales remain low), the Court rejects LiphaTech's assertion that the Agency was not required to consult under the ESA.

[14] Although only the NRDC's Complaint asks the Court to enjoin the registration of Rozol pending the completion of consultation (*compare* NRDC Compl. at 14 *with* Defenders' Compl. at 16-17), plaintiffs have jointly submitted briefing arguing that such relief would be appropriate.  (Pls.' Reply at 10.)

unanimous support in other decisions where courts have found that issuing an order to consult would accomplish nothing when the Agency has already begun consulting. *Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1103 (E.D. Wash. 2006); *Am. Littoral Soc'y v. EPA Region*, 199 F. Supp. 2d 217, 247 (D.N.J. 2002). Similar to the plaintiff in *American Littoral Society*, the Defenders "seek consultation" (*see* Defenders Compl. at 16-17) even though the Agency is already "engaging in consultation." *Am. Littoral Soc'y*, 199 F. Supp. 2d at 247; *see also Martin*, 454 F. Supp. 2d at 1103 ("no effective relief" could be granted because defendants had "already engaged in consultation"). Thus, because the Defenders only seek a Court order requiring the Agency to "engage in" consulting with FWS, and because the Agency has already "engaged" in consultation, their claim for injunctive relief is moot.

Similarly, the Agency's action has mooted the Defenders' claim for declaratory relief.[15] An order declaring that the Agency acted illegally by failing to consult with the FWS would "accomplish nothing," *Larsen*, 525 F.3d at 4, because the Agency has already begun consulting and, thus, has provided the Defenders with the relief they seek.[16] Therefore, granting the Defenders' request would result in an "improper advisory opinion." *See Conservation Force v. Salazar*, 715 F. Supp. 2d 99, 105 (D.D.C. 2010) (declaration that failure to timely review applications violated the ESA would be an advisory opinion where the agency had subsequently processed the applications). To the extent there is relevant case law, it agrees that declaratory relief would accomplish nothing, since "the [Agency]'s commencement of consultation is

---

[15] The fact that plaintiffs seek declaratory relief does not prevent their claim from becoming moot. *Conservation Force v. Salazar*, 715 F. Supp. 2d 99, 105 (D.D.C. 2010) (claim for declaratory relief will not be moot where there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment") (emphasis omitted); *see also Byrd*, 174 F.3d at 244 (request for declaratory relief was not moot because plaintiff could still be afforded "some relief").

[16] Although plaintiffs also ask the Court to vacate the registration of Rozol as a result of the Agency's failure to comply with the ESA (Pls.' Reply at 11), vacatur would be inappropriate in this case as a remedy for violations of the APA, for the reasons discussed below (*see infra*, Part II.A.2). The Court will therefore not consider vacatur in its discussion of prospective relief for plaintiffs' ESA claims.

sufficient to moot" a request for a declaration that the Agency has violated the ESA. *Am. Littoral Soc'y*, 199 F. Supp. 2d at 247 (request for declaration that Agency violated the ESA by failing to comply with § 7 was moot where Agency had begun consulting with FWS); *see also Martin*, 454 F. Supp. 2d at 1103 (claim for declaratory judgment was moot because no effective relief was possible where plaintiffs sought a court order requiring consultation and defendants had already begun to consult); *Sw. Ctr. for Biological Diversity v. Forest Serv.*, 82 F. Supp. 2d 1070, 1079 (D. Ariz. 2000) ("academic" for the court to "consider . . . demand for a declaratory judgment" that § 7(a)(2) was violated "*when the complaint was filed*, but not now").[17]  As in *American Littoral Society, Southwest Center for Biological Diversity,* and *Martin*, the only relief the Defenders seek here — an order that the Agency "engage in formal consultation" prior to reissuing the registrations — would be pointless.

In contrast, the NRDC's claims are not moot because an "effective remedy is possible and appropriate."  13C Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533.3.1 (3d ed. 2008).  Even a "partial remedy is sufficient to prevent a case from being moot."  *Byrd*, 174 F.3d at 244 (quoting *Calderon*, 518 U.S. at 150).  The Court may grant the NRDC at least part of the relief it seeks by enjoining the Agency from authorizing the use of Rozol until it completes the formal consultation process (NRDC Compl. at 14).[18]  *See*

---

[17] Plaintiffs attempt to distinguish *Southwest Center*, pointing out that the parties in that case agreed that the Forest Service was no longer violating the ESA. (Pls.' Reply at 12.)  However, the court's opinion makes it clear that this was not the reason why the claim for injunctive relief was moot. *See Sw. Ctr. for Biological Diversity*, 82 F. Supp. 2d at 1079 ("The Forest Service is correct to point out that '[i]t would be academic for the Court to consider [Southwest Center's] demand for a declaratory judgment that the Forest Service was in violation of section 7(a)(2) of the [Act] when the Complaint was filed, but not now,' or for 'the Court to order the Forest Service to engage in consultation, as [Southwest Center's] Complaint requests, when it has already done so").  Thus, the two requests for relief were moot for separate reasons: the demand for declaratory judgment was moot because the Agency was no longer in violation of § 7(a)(2), and the demand for injunctive relief was moot because the defendant had begun consulting.

[18] Like the plaintiff in *American Littoral Society* and like the Defenders, the NRDC seeks a "declaration that EPA is in violation of the ESA . . . and an injunction ordering EPA to comply with section 7."  199 F. Supp. 2d

*Wash. Toxics Coal.*, 413 F.3d at 1035 (affirming district court order enjoining Agency authorization of pesticides pending Agency's completed consultation with FWS). It is "well-settled that a court can enjoin agency action pending completion of section 7(a)(2) requirements." *Id.* at 1034. Indeed, according to the Ninth Circuit, if the Agency has committed "substantial procedural violation[s]," of the ESA, the remedy "*must* therefore be an injunction of the project pending compliance." *Id.* (emphasis added); *see also Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1147 (11th Cir. 2008) ("settled" that court may enjoin agency from "further noncompliant action pending satisfaction" of the ESA). In *Washington Toxics Coalition*, the Ninth Circuit affirmed a district court's order enjoining the Agency from authorizing the use of pesticides pending *completion* of its obligation to consult with the FWS. *See* 413 F.3d at 1029. Similarly, in *Martin*, a case on which plaintiffs and defendants rely (*see* Pls.' Reply at 11; Defs.' Mot at 33), a district court in the Eastern District of Washington enjoined an agency from authorizing snowmobiling in a protected area until the "*completion* of formal consultation." 454 F. Supp. 2d at 1099 (emphasis added). Thus, because the Court may enjoin the Agency from allowing the use of Rozol until it has finished consulting with the FWS, the NRDC's claim under the ESA is not moot.

In response, defendants rely on four cases to support their argument that the NRDC's request for an injunction is moot: *Martin, American Littoral Society*, *Southwest Center for Biological Diversity* and *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724 (10th Cir. 1997). (Defs.' Mot. at 32-33.) These cases, however, are easily distinguishable.

In *Martin*, the court was confronted with separate requests for declaratory and injunctive relief after the Forest Service failed to consult with the FWS prior to authorizing snowmobiling

---

at 246. Unlike the plaintiff in that case, the NRDC *also* seeks to enjoin the enforcement of the Agency's rule pending the completion of consultation.

in caribou habitats.  454 F. Supp. 2d at 1089.  The court held that a claim for injunctive relief

was *not* moot and that an injunction pending completion of "formal consultation" was the

appropriate relief for an alleged violation of § 7(a)(2).  *Id.* at 1099.  The court also held that a

declaration that an agency had violated § 7(a)(2) by failing to consult with the FWS would be

moot because the agency in question had begun consulting.  *Id.* at 1103.  The court drew an

implicit distinction between an order "request[ing] consultation," which was moot, and an order

enjoining the agency from enforcing permits granted without consultation with the FWS, which

was not moot.  *Id.*  In other words, *Martin* appears to draw the same distinction as this Court is

drawing here: when the Agency begins consulting with the FWS, an order requiring consultation

is moot, but an order preventing continuation of an agency's action until consultation has

finished is not moot.

The plaintiffs in *American Littoral Society* alleged that the Agency failed to consult with

the FWS prior to approving actions by the State of New Jersey.  199 F. Supp. 2d at 244.  The

plaintiffs asked for a declaration that the Agency violated the ESA by failing to comply with § 7

and for an injunction "ordering the EPA to comply with section 7."  *Id.* at 246.  They did not ask

the court to enjoin the agency from acting pending completion of consultation.  *Id.*at 245.  The

Agency argued that it had rendered this claim moot by initiating consultation with the FWS.  *Id.*

The court found that issuing declaratory or injunctive relief would "serve no purpose" because

the Agency had already begun consulting.  *Id.* at 246.  It also rejected plaintiffs' argument that

relief was still available because consultation was not complete, reasoning that it would be

inappropriate to order the Agency to complete formal consultation when it was unclear that

consultation was even necessary.  *Id.* at 247-48.  Thus, although this opinion relates to whether a

declaratory judgment is appropriate, its holding on the availability of injunctive relief is more relevant to the Defenders' claims than to the NRDC's.

In *Southwest Center for Biological Diversity*, the Court was asked for a different type of injunctive order than the one requested by the NRDC. 82 F. Supp. 2d at 1079. The plaintiff there sought a declaration that the Forest Service failed to consult with the FWS before issuing grazing permits and an injunction "barring" the Forest Service from allowing grazing until the FWS or the court determined that it was acting in accordance with § 7(d). *Id.* at 1071, 1079. The court found that neither the statute "nor any other court decision" supported such an injunction. *Id.* at 1080. Here, plaintiffs seek an injunction pending compliance with § 7(a)(2), not an investigation into whether the Agency has "foreclos[ed] the formulation or implementation of any reasonable and prudent alternative measures." *Id.* at 1079. At least two cases support the availability of such relief. Thus, *Southwest Center* is distinguishable.

Finally, in *Southern Utah Wilderness Alliance*, the Tenth Circuit was asked to order the agency to consult with the FWS, even though the agency had "fully satisfie[d] the consultation requirement of section 7(a)(2)." *S. Utah Wilderness Alliance*, 110 F.3d at 728. Unsurprisingly, the court found that the "changed circumstances of this particular case no longer present an opportunity for meaningful relief"[19] and that there was "no point in ordering an action that has already taken place." *Id.* at 728-29. Here, because the NRDC seeks a different type of injunctive relief, and because the Agency has not yet completed consultation with the FWS, the Court may still grant effective relief.

Defendants also argue that plaintiffs' claims are moot because the Agency has "completely and irrevocably eradicated the effects of the alleged violation" of the ESA. (Defs.'

---

[19] The Tenth Circuit was careful to note, however, that its decision was not "general approval for consultation after the fact." *S. Utah Wilderness Alliance*, 110 F.3d at 729.

Mot. at 35 (quoting *Cty. of Los Angeles*, 440 U.S. at 631).)  *Completing* the consultation process might well eradicate the effects of a § 7(a)(2) violation.  *See Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 765 (8th Cir. 2004) ("adopt[ing]" position that a "claim that seeks both declaratory and injunctive relief was mooted when the required consultation was completed"); *S. Utah Wilderness Alliance*, 110 F.3d at 728 (same).  Here, however, the Agency has not finished consulting with the FWS.  Thus, the alleged violation and its effects remain.[20]  *See Wash. Toxics Coal*, 413 F.3d at 1034 (approving injunction pending completion of § 7(a)(2) requirements); *Martin*, 454 F. Supp. 2d at 1099 (same).

The Agency also argues that by seeking injunctive relief, plaintiffs are attempting to escape the boundaries of their complaints and make "substantive" claims under the ESA.  (Defs.' Reply at 15-16 & n.9.)  The Court does not read plaintiffs' invocation of § 7(a)(2) in this way.  It is clear that § 7(a)(2) of the ESA contains *both* a substantive *and* procedural requirement.  *Nat'l Ass'n of Home Builders*, 551 U.S. at 668 (§ 7(a)(2) "imposes a substantive (and not just a procedural) statutory requirement.").  Substantively, it requires that agencies ensure that their actions are not likely to jeopardize the existence of an endangered species.  Procedurally, it requires adequate consultation between the Agency and the FWS.  *See Nat'l Wildlife Fed. v. Brownlee*, 402 F. Supp. 2d 1, 9 (D.D.C. 2005) (granting declaratory judgment and setting hearing to determine proper injunctive relief based on "purely legal procedural challenge" to

---

[20] The Court recognizes that this differs from the position taken by the district court in *Southwest Center for Biological Diversity*.  *See* 82 F. Supp. 2d at 1078.  However, the court in that case did not conduct any analysis because the parties already agreed that the Agency had cured its violation of the ESA.  Thus, the court in that case did not need to decide whether initiating formal consultation mooted  a claim for failure to consult.

Moreover, while the court in *American Littoral Society* refused to order the Agency to complete consultation, the Agency in that case had not determined that formal consultation was necessary.  199 F. Supp. 2d at 247-48.  The court refused to require "formal consultation absent" such a finding.  *Id.*  Here, the Agency has already begun formal consultation, and does not contest that formal consultation is required.

Defendants have not cited a case in which a court analyzed § 7(a)(2) and concluded that a violation of § 7(a)(2) is cured when consultation begins.  Neither *Southwest Center* nor *American Littoral Society* stand for the proposition argued by defendants that this Court cannot provide relief once the Agency has initiated formal consultation.

Corps of Engineers' failure to consult with FWS).  Plaintiffs seek a court order requiring the Agency to "complete formal consultation . . . prior to registering (or allowing registration of) Rozol."  (Pls.' Reply at 11 (quoting NRDC Compl. at 14).)  Thus, it is clear that plaintiffs can make (and have made) a procedural claim under § 7(a)(2).

LiphaTech also argues that any claim plaintiffs have made regarding the continued registration of Rozol "during the consultation process" is governed by § 7(d) of the ESA. (LiphaTech Reply at 17-19.)  But it is clear that courts have enforced § 7(a)(2) without recourse to § 7(d).  *Washington Toxics Coalition* noted that, although § 7(d) supported the district court's determination that an injunction against the continued use of pesticides was proper under § 7(a)(2), § 7(d) did not directly apply because "no irreversible or irretrievable commitment of resources" had occurred.  *See Wash. Toxics Coal.*, 413 F.3d at 1034-35.  Indeed, § 7(d) was relevant only because it "belie[d] the intervenors'" argument that "further injunctive relief could not be granted during consultation."  *See id.* at 1034.  Similarly, in *Martin*, the court was persuaded that "the availability of section 7(d) is no reason to hold that an injunction to enforce section 7(a)(2) should not be kept in force until consultation is completed."  454 F. Supp. 2d at 1097 (quoting *Sw. Ctr. for Biological Diversity v. Forest Serv.*, 307 F.3d 964, 974 (9th Cir. 2002) (Canby, J., dissenting) (vacated as moot)).  Rather than replace § 7(a)(2), it is clear that § 7(d) independently prevents agencies from "sinking resources into a project in order to ensure its completion regardless of its impacts on endangered species."  *Wash. Toxics Coal.*, 413 F.3d at 1034-35.  Plaintiffs' failure to bring a claim under § 7(d) therefore does not prevent them from obtaining the injunctive relief requested by the NRDC here.

The Agency makes the separate, but related, argument that it was permitted to register Rozol because § 7(d) allows it to take any action it wishes during the consultation process, so

long as it does not "irreversib[ly]" or "irretrievabl[y]" commit resources so as to "foreclose[e] the formulation or implementation of any reasonable and prudent alternative measures . . . ." (Defs.' Reply at 18 n.12.)  However, as explained, "§ 7(d) does not replace the requirements found in § 7(a)(2); rather, it 'clarifies' those requirements."  *Martin*, 454 F. Supp. 2d at 1096; *see also Scott Timber Co. v. United States*, 64 Fed. Cl. 130, 140 (Fed. Cl. 2005) (§ 7(d) was "not redundant" but instead clarified § 7(a)(2)).  The Agency provides no case law to support its interpretation of the statute, and the Court will not accept the Agency's invitation to transform a narrow prohibition into a broad grant of authority.  *See Wilson v. Block*, 708 F.2d 735, 750 (D.C. Cir. 1983) (refusing to extend "§ 7 (a)(2) protection, *including the § 7(d) limitation*" to all "vulnerable" species (emphasis added)).  Plaintiffs need not establish that the Agency has made an "irreversible or irretrievable commitment of resources" to bring a claim under § 7(a)(2).[21]

The Agency essentially admits that it utterly failed to satisfy the procedural requirements of § 7(a)(2) of the ESA before registering Rozol.  Moreover, plaintiffs allege that the current use of Rozol is harming endangered species.  Thus, the Court may enjoin the Agency's registration of Rozol until it finishes its formally consultation with the FWS, since plaintiffs' claim is not moot because an "effective remedy" is still possible.  *See Larsen*, 525 F.3d at 4.

### 3.    Prudential Mootness

The Agency argues that "prudential mootness" also applies, and that even if the Court has jurisdiction over the ESA claim, it should exercise its discretion and "stay its hand."  (Defs.' Mot. at 34.)  Prudential mootness allows the Court to dismiss a case that is not actually moot but is "so attenuated that considerations of prudence and comity for coordinate branches of

---

[21] Although the Ninth Circuit has allowed "non-jeopardizing agency actions" to continue during the consultation process, the burden is on the agency to prove that its action is "non-jeopardizing.  *Wash. Toxics Coal.*, 413 F.3d at 1035.  The Agency has argued that it has taken measures to mitigate the potential impact of Rozol on endangered species, (Defs.' Mot. at 36-37), but it has not argued that Rozol is "non-jeopardizing" altogether.

government counsel the Court to stay its hand, and to withhold relief that it has the power to grant." *Chamber of Commerce v. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980). This doctrine is relevant where it is "unlikely that the court's grant of declaratory judgment will actually relieve the injury," especially where exercising discretion would "avoid adjudication of difficult or novel constitutional questions." *Foretich v. United States*, 351 F.3d 1198, 1216 (D.C. Cir. 2003) (quoting *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991)). Here, however, an injunction would provide the plaintiffs with the relief they seek: cessation of the use of a deadly chemical that may jeopardize the continued survival of endangered species until the Agency complies with the mandates of the ESA. The Court therefore declines to exercise its discretion and will not invoke "prudential mootness."

## II.     FIFRA VIOLATIONS[22]

Plaintiffs argue that defendants have already conceded that they violated FIFRA because the Agency has admitted that it did not issue a notice of receipt of the Rozol application; did not solicit public comment before registration; did not publish a notice of issuance, with responses to comments; and did not post a final label for Rozol in its online system until five months after the product was registered. (Pls.' Mot. at 22.) Defendants disagree, arguing that the Court can no longer provide effective relief and that plaintiffs' FIFRA claims are now moot because the Agency provided notice and comment during the cancellation proceedings. (Defs.' Mot. at 15-16.) Moreover, defendants argue, even if plaintiffs' claims are not moot, they are entitled to summary judgment because the Agency had no obligation to provide notice and comment.

---

[22] The NRDC's claims under FIFRA are brought in its Second and Third Claims for Relief (NRDC Compl. at 11-13), and Defenders have brought their FIFRA claims in Counts II, III and IV. (Defenders' Compl. at 14-15.)

(LiphaTech Mot. at 11-17.)  Because the Court finds that the FIFRA claims are moot, it need not

address defendants' substantive arguments.[23]

### A.    Mootness

The Agency seeks dismissal of plaintiffs' FIFRA claims on mootness grounds.  It argues

that simply remanding and ordering the Agency to provide opportunity for notice and comment

would be pointless and duplicative because it has already provided an opportunity for notice and

comment on whether Rozol causes "unreasonable adverse effects," in response to a cancellation

petition filed by the WWF.  (Defs.' Mot. at 15-16.)  The Agency concedes that *vacating* the

Rozol registration and remanding would "grant relief that is 'effective' in the sense that it would

meaningfully affect the status quo."  (*Id.* at 16.)  In other words, even though the notice and

comment process would be duplicative, plaintiffs' FIFRA claims would not be moot because

vacating Rozol's registration could partially provide them with the relief they seek.  *See Byrd*,

174 F.3d at 244.  However, the Agency argues that vacatur would be inappropriate here because

it would unduly disrupt the regulatory process and would have serious adverse implications for

public health and the environment.  (Defs.' Mot. at 16.)  The Court agrees.[24]

### 1.    Remand Would Be Duplicative

The Agency completed notice and comment during its review of the WWF's cancellation

petition.  It argues that this review is effectively the same as the review that would occur prior to

registration and that, because the Court should not "order the [Agency] . . . to do something that

it has already done," *Natural Res. Def. Council, Inc. v. Nuclear Regulatory Comm'n*, 680 F.2d

---

[23] As the Court does not address the Agency's argument that Rozol was not a "new use" of chlorophacinone, it need not refer to plaintiffs' additional evidence on the subject.  (Pls.' Reply at 17 n.12.) Plaintiffs' motion to supplement the record (Dkt. No. 37) will therefore be denied as moot.

[24] The distinction between remand without vacatur and remand with vacatur, which the Agency concedes would be meaningful relief (Defs.' Mot. at 16), is that the registration would remain effective while the agency conducted notice and comment.

810, 814 (D.C. Cir. 1982), no effective relief is available. (Defs.' Mot. at 16.) The Agency's argument depends upon the proposition that, under FIFRA, there is no difference in the standard for cancelling and for registering a product. If the two are functionally the same, remanding for notice and comment without vacating would be pointless and ineffective, because this would simply require the Agency to re-examine the same evidence under the same standard. *See Natural Res. Def. Council, Inc.*, 680 F.2d at 813-15 (claim alleging failure to provide notice and comment was moot where agency repromulgated regulations that were "essentially the same" as those challenged).

Defendants suggest that registration and cancellation are equivalent because the burden of persuasion in hearings always lies with the party advocating registration. (Defs.' Mot. at 19-20.) Moreover, it is clear that the burden of proof is identical in a registration hearing and a cancellation hearing. *See, e.g.*, *Envtl. Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 593 (D.C. Cir. 1971) (manufacturer bears burden of proof in cancellation hearing); 40 C.F.R. 164.80(b) (burden of persuasion lies with proponent of registration "[o]n all issues arising in connection *with the hearing*") (emphasis added); 40 C.F.R. 164.121(g) (burden of persuasion in expedited hearing lies with proponent of registration). However, a cancellation hearing cannot take place, and, therefore, the burden of persuasion cannot shift to the applicant until the Agency *first* determines that the pesticide "generally causes unreasonable adverse effects."[25] 7 U.S.C. § 136d(b). *See Envtl. Def. Fund, Inc.*, 439 F.2d at 593 ("Congress intended any substantial question of safety to trigger the issuance of cancellation notices, *shifting to the manufacturer the burden* of proving the safety of his product") (emphasis added). Thus, although the standard on

---

[25] Based on the Agency's regulations, it appears that only the Agency or a person "adversely affected" by cancellation can trigger a cancellation hearing. *See* 40 C.F.R. § 164.20(a) (hearing may be requested by "any person adversely affected by a notice of the Administrator of his . . . his intent to cancel the registration"). *See also Reckitt Benckiser Inc.*, 613 F.3d at 1134 ("parties may obtain district court review of EPA's refusal to cancel a registration"). Thus, plaintiffs in this case could not have triggered a cancellation hearing.

appeal is also relevant, the issue here is whether the Agency uses the same standard in determining whether to conduct a cancellation hearing.

Plaintiffs argue that registration and cancellation are "fundamentally different" because to register a product, the Agency must find that it has "no unreasonable adverse effects," but to cancel a registration, it must find that the product "generally causes unreasonable adverse effects." (Pls.' Reply at 4-5.) Thus, to hold a cancellation hearing, the Agency would have needed to conclude that Rozol "appear[ed]" to "generally cause[] unreasonable adverse effects on the environment."[26] 7 U.S.C. § 136d(b). When conducting notice and comment while evaluating an application, the Agency must determine that Rozol would not "significantly increase the risk of any unreasonable adverse effect on the environment" caused by chlorphacinone in order to approve registration.[27] 7 U.S.C. § 136a(c)(7)(A). Plaintiffs suggest that if the evidence of unreasonable adverse effects is inconclusive, the Agency may neither register Rozol nor cancel its registration and that, therefore, the two standards are different.[28] Plaintiffs compare the two standards to a "presumption of guilt" versus a "presumption of innocence," arguing that remand would not be duplicative because even if the Agency were

---

[26] After conducting notice and comment on the WWF petition, the Agency determined that a cancellation hearing was inappropriate, despite finding that Rozol had a "profile of ecological risks that require careful scientific evaluation." (Defs.' Mot., Ex. D, at 1-2.)

[27] Plaintiffs focus on the standard for registering active ingredients for the first time, which is set forth at 7 U.S.C. § 136a(c)(5). This standard is not relevant here because chlorphacinone has already been approved by the Agency; Rozol was approved under the provision for "me-too" registration, and presumably would be evaluated under that standard again if the Court vacated its registration.

[28] Plaintiffs argue that the Agency's response in the WWF case illustrates the different standards in cancellation and registration cases. (Pls.' Reply. at 21.) Despite refusing to begin cancellation proceedings, the Agency determined that Rozol's "potential to affect the black-footed ferret, and other listed species, must be properly evaluated to meet the FIFRA registration standard." (Defs.' Mot., Ex. D, at 2.) Plaintiffs suggest that registration would be improper if the Agency lacked this information. However, the Agency may register a pesticide under 7 U.S.C. § 136a(c)(7)(A) even without information that is required when registering a new pesticide under § 136a(c)(5). LiphaTech's application for Rozol was specifically approved pursuant to § 136a(c)(7)(A). (AR 86 at 1.) Thus, the Agency's request for additional information does not prove that registration and cancellation are judged under different standards.

confronted with all the same facts and arguments that had been submitted by the WWF, it would weigh them differently. (Pls.' Reply at 8.)

The Court finds defendants' argument persuasive for two reasons. First, the Agency stated in its decision on the WWF petition that "[t]he standard for cancellation [under FIFRA] is the same as the criteria for registration." (Defs.' Mot., Ex. D at 4.) Semantic differences notwithstanding, the Agency appears to use the same standard for evaluating "unreasonable adverse effects" in cancellation and registration proceedings, and that it, in fact, used the "registration" standard when considering the Rozol cancellation petition. Thus, remand would be duplicative here because the Agency *actually used the same standard* when conducting notice and comment on the WWF petition that it would use if the Court were to choose to remand now.

Precedent in this Circuit also suggests that the two proceedings are similar. The Agency must "issue notices" of cancellation or a cancellation hearing "whenever there is a substantial question about the safety of a registered pesticide." *Envtl. Def. Fund, Inc.*, 439 F.2d at 594. This "substantial question" standard is "perhaps even less rigorous than the typical 'reason to believe' with which many agencies begin enforcement proceedings." *Nat'l Coal. Against the Misuse of Pesticides v. EPA*, 867 F.2d 636, 643 (D.C. Cir. 1989). Thus, the Agency need not affirmatively find that a pesticide causes an adverse effect to call for a hearing. Rather, it must do so whenever a substantial question of safety is posed.

The Court therefore finds that the standards of review in application and cancellation proceedings are sufficiently similar to make notice and comment during each process functionally the same. Remanding without vacatur would therefore require the Agency to carry

out the same notice and comment procedure that it completed less than seven months ago, and as such, would be duplicative and unnecessary.[29]

The Court disagrees with plaintiffs' contention that *Natural Resource Defense Council v. EPA*, 676 F. Supp. 2d 307 (S.D.N.Y. 2009), supports the argument that there is a substantive distinction between registration and cancellation. (Pls.' Reply at 5-6.) In that case, which dealt with the initial registration of a pesticide under 7 U.S.C. § 136(c)(5), the court vacated and remanded because it found it "more appropriate" to place the "burden" on the Agency to "register the pesticide lawfully" than to force the plaintiff to bear that cross. *Natural Res. Def. Council*, 676 F. Supp. 2d at 316. The court did not, however, address whether the burdens in cancellation and registration proceedings are different. In context, it is clear that the "burden" the court referred to was the "costly and time consuming" nature of removing a pesticide from the market, not the legal burden required to justify cancellation. *Id.* Thus, the case does not support plaintiffs' argument that there is a different burden of proof in cancellation and registration proceedings.

## 2. Vacatur Would Be Inappropriate

The Agency concedes that vacating the Rozol registration would "meaningfully alter the status quo" and, by implication, suggests that vacatur would provide plaintiffs with the relief they seek. (Defs.' Mot. at 16.) However, the Agency argues that vacatur would be inappropriate. The "decision whether to vacate depends on the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Comcast Corp. v. FCC*, 579

---

[29] Because the Agency carried out a separate notice and comment during cancellation proceedings and did not engage in "reconsideration of the substantive decision" it made to register Rozol (Pls.' Mot. at 27), there was no *post hoc* notice and comment, and therefore, *New Jersey v. EPA*, 626 F.2d 1038 (D.C. Cir. 1980), does not apply.

F.3d 1, 8 (D.C. Cir. 2009) (quoting *Allied-Signal, Inc. v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

The rule's serious deficiencies suggest that vacatur is appropriate. Failure to provide notice and comment is "a fundamental flaw that 'normally' requires vacatur of the rule," as is an "explanation of the basis and purpose" of a rule "so inadequate that the reviewing court cannot evaluate it." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009). However, the "absence of notice and comment is not a substantive infirmity that *mandates* vacatur," although "it nonetheless constitutes a procedural error of sufficient gravity for the court of appeals to have opted for vacatur recently and with some regularity." *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 89 (D.D.C. 2007). Thus, assuming for the purposes of this mootness inquiry that the Agency violated the APA by not providing notice and comment, the first *Allied-Signal* factor weighs in favor of vacatur.

Nonetheless, the second *Allied-Signal* factor weighs heavily against vacatur. Where the proverbial "egg has been scrambled and there is no apparent way to restore the status quo ante," the Court may remand without vacating.[30] *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002).[31] *Compare also MCI Telecomms. Corp. v. FCC*, 143 F.3d 606, 609 (D.C. Cir. 1998) (exercising discretion to remand where vacatur would leave private parties "all but uncompensated for coinless calls" and would "disrupt the business plans they have made"),

---

[30] Mere "costs or 'field-level' effects" associated with vacatur are an insufficient justification for refusing to vacate. *Reed v. Salazar*, 744 F. Supp. 2d 98, 119-20 (D.D.C. 2010); *see also Nat. Res. Def. Council v. EPA*, 676 F. Supp. 2d 307, 316 (S.D.N.Y. 2009) (rejecting argument that private party invested $90 million in testing and registration of chemical under FIFRA and stood to lose "tens of millions of dollars in sales" if the registration were vacated). However, this is not a case where a private party would simply suffer pecuniary loss as a result of vacatur. Rather, the situation is analogous to the one in *Sugar Cane Growers*, in that LiphaTech has acted in reliance on an agency's orders and has essentially "plowed under" its existing local registrations by voluntary cancelling them. *Sugar Cane Growers Coop.*, 289 F.3d at 97-98. *See infra* note 31.

[31] In *Sugar Cane Growers*, sugar cane and sugar beet farmers, in reliance on administrative action, destroyed their own crops in exchange for compensation from the government. *Sugar Cane Growers Coop.*, 289 F.3d at 91-93. The court refused to vacate because the sugar crops had already been "plowed under" and there was no way to return to the status quo. *Id.* at 97-98.

*with AFL-CIO v. Chao*, 496 F. Supp. 2d at 92 ("the fact that vacatur preserves the status quo . . .

favors, rather than undermines, vacatur as a remedy"). LiphaTech has already cancelled its

individual registrations of Rozol in six states as a condition for receiving broader approval from

the Agency. (AR 86 at 1.) Thus, vacating the Agency's decision would not return the

defendant-intervenor to the status quo, but instead, it would punish LiphaTech for following the

Agency's directions. (*Id.*) As with the farmers in *Sugar Cane Growers*, vacatur would not

return LiphaTech to the status quo before the Agency's action. *See Sugar Cane Growers Coop.*,

289 F.3d at 97-98. Moreover, Rozol's registration has taken effect and the product is currently

being used in the field. Thus, if the Court were to vacate the Agency's decision, farmers in

Colorado, Kansas, Nebraska, Oklahoma, Texas, and Wyoming would be unable to use Rozol,

even though the Agency had approved local use of the product and has recently concluded that

cancellation is not warranted. This would lead to another round of regulatory proceedings at the

state level, which the Agency would need to evaluate and rule upon while it conducted a second

round of notice and comment. (Defs.' Mot. at 19.) The Court will not issue this "invitation to

chaos." *Sugar Cane Growers Coop.*, 289 F.3d at 97. The high likelihood that vacatur would

cause significant disruption weighs strongly against it.

     Applying the *Allied-Signal* factors, 988 F.2d at 150, the Court concludes that there are

several strong reasons to believe that vacating Rozol's registration would have significant

disruptive consequences. The registration at issue is in effect; Rozol is currently being used to

control the prairie dog population; and LiphaTech has voluntarily cancelled its local registrations

in six states in favor of the Agency's § 3 regulation. Thus, vacatur could lead to the scattered

resurrection of these local registrations and a renewed need for review and approval by the

Agency. Balanced against these weighty concerns is the Agency's serious and fundamental

failure to provide notice and comment. However, the consequences of vacatur are sufficiently severe to compensate for this serious failure. Thus, vacatur "is not the required remedy." *AFL-CIO*, 496 F. Supp. 2d at 91, and it would not be appropriate here.

In sum, the Court has determined that vacating the Agency's registration would be inappropriate. Moreover, simply remanding the case to the Agency for further notice and comment would be duplicative. Thus, because no "effective remedy" is available to address plaintiffs' FIFRA claims, they are moot, *see Larsen*, 525 F.3d at 4, and the Agency's motion to dismiss these claims on jurisdictional grounds will be granted.

## III.    MIGRATORY BIRD ACT AND EAGLE ACT (DEFENDERS' CLAIM SEVEN)

Plaintiffs' claims under the Migratory Bird and Eagle Acts must be dismissed because FIFRA already provides an "adequate remedy in a court." *See* 5 U.S.C. § 704. Individual plaintiffs may enforce the Migratory Bird Act against government agencies, but must do so through the review provision of the APA.[32] *See Am. Bird Conservancy v. FCC*, 516 F.3d 1027, 1031 (D.C. Cir. 2008) ("the MBTA applies to federal agencies"); *Humane Soc'y v. Glickman*, 217 F.3d 882, 888 (D.C. Cir. 2000) (granting private individuals' request for injunction against agency that planned to take and kill Canada geese without a permit); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 217 (D.D.C. 2003) ("the law of this Circuit is clear: a plaintiff may sue a federal agency under the APA for violations of the [Migratory Bird Act].") (quoting *Ctr. for Biological Diversity v. Pirie*, 191 F. Supp. 2d 161, 175 (D.D.C. 2002)).

This general rule does not control in this case, however, because FIFRA already provides a framework for reviewing the Agency's decisions. As the Eighth Circuit has recognized, plaintiffs may not enforce the Migratory Bird and Eagle Acts through the APA where FIFRA

---

[32] Neither party suggests that the Court should analyze the Eagle Act separately. (*See* Pls.' Reply at 22; Defs.' Mot. at 37-39.) The Court will therefore treat the standard for APA enforcement under each law as the same.

provides a framework for obtaining relief. *Defenders of Wildlife v. Adm'r, EPA*, 882 F.2d 1294, 1302 (8th Cir. 1989). In that case, the plaintiff brought claims under the Migratory Bird and Eagle Acts against the Agency's continued registration of strychnine. *Id.* at 1296-99, 1301-02. The Court stated that it was "reluctant" to allow this type of "collateral challenge" to the Agency's action, and that challenges to pesticide registrations were more properly pursued under FIFRA because that statute allowed plaintiffs to "petition the EPA to cancel registrations or request other action," and to obtain review in the district court.[33] *Id.* at 1302. Because this "framework" already provided an "adequate remedy," the district court lacked jurisdiction over the Migratory Bird and Eagle Act claims brought via the APA. *Id.*

The Eighth Circuit's reasoning is both persuasive and entirely consistent with precedent in this Circuit. *Glickman* involved a "Goose Management Program" instituted by the Department of Agriculture and did not involve FIFRA or any other broader statutory scheme. *Glickman*, 217 F.3d 882. Similarly, in *Fund for Animals*, the plaintiffs launched a direct challenge to action taken under the permit provision of the Migratory Bird Act. *See Fund for Animals*, 281 F. Supp. 2d at 217, 235-37. Plaintiffs have not cited, nor can the Court find, any case in which a court has used the Migratory Bird Act or the Eagle Act to invalidate Agency action taken under FIFRA.[34] The Court will therefore dismiss plaintiffs' claim under these Acts.

---

[33] Plaintiffs argue that *Defenders of Wildlife* is distinguishable because it appealed a request to cancel registration rather than to vacate. (Pls.' Reply at 23.) However, this distinction did not determine the court's decision in that case. The key issue before the Eighth Circuit was whether plaintiffs could use the Migratory Bird and Eagle Acts to launch a collateral challenge to actions taken under FIFRA. Just as in *Defenders of Wildlife*, plaintiffs here could (and have sought to) "obtain judicial relief in the district court as provided by FIFRA." *Defenders of Wildlife*, 882 F.2d at 1302 (citing 7 U.S.C. § 136n(a) ("other final actions of the Administrator not committed to the discretion of the Administrator by law are judicially reviewable by the district courts of the United States.")). This "adequate remedy" precludes judicial review under the APA. *Id.*

[34] *American Bird Conservancy* allowed the FCC to defer consideration of Migratory Bird Act violations and did not confront the collateral challenge issue. 516 F.3d at 1032.

## IV.    EXECUTIVE ORDER 13186 (DEFENDERS' CLAIM VII)

Plaintiffs ask the Court to find that the Agency has violated Executive Order 13186 by failing to produce a "Memorandum of Understanding," despite taking action "likely to have[] a measurable negative effect on migratory bird populations. (Pls.' Mot. at 29.) Plaintiffs cite to cases from this Circuit enforcing other executive orders under the review provisions of the APA where the orders were based on statutory authority and created substantive limits on agency discretion. (Pls.' Reply at 24 (citing *Wilderness Soc'y v. Salazar*, 603 F. Supp. 2d 52, 70-71 (D.D.C. 2009); *Daingerfield Island Protective Soc'y v. Babbitt*, 823 F. Supp. 950, 960 n.36 (D.D.C. 1993)).) However, plaintiffs' attempt to enforce this order is made hopeless by the language of the order itself, which explicitly rules out the possibility of judicial review.

Executive Order 13186 contains a section labeled "Application and Judicial Review," which provides that it is "intended only to improve the internal management of the executive branch and does not create any right or benefit, substantive or procedural, separately enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person." Exec. Order 13186, 66 Fed. Reg. 3853 (Jan. 10, 2001). This Circuit held that identical language in Executive Order 12893 meant that the order was "not subject to judicial review," and that plaintiff's attempt to use the order as evidence that the agency had acted arbitrarily and capriciously was "nothing more than an indirect — and impermissible — attempt to enforce private rights under the order." *Air Transp. Assoc. of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999); *see also Alliance for Natural Health U.S. v. Sebelius*, No. 09-1523, 2011 WL 1296888, at *19 n.10 (D.D.C. Apr. 6, 2011) (identical language in Executive Order 12866 prevented plaintiffs from suing based on alleged violations of that Order). The

same logic applies here.  Plaintiffs cannot use the review provisions of the APA to enforce an Executive Order that is not subject to judicial review, and therefore, this claim will be dismissed.

## CONCLUSION

Defenders' claim for declaratory and injunctive relief under the ESA and the plaintiffs' claims under FIFRA are moot.  Moreover, plaintiffs' Migratory Bird Act and Eagle Act claims must be dismissed because FIFRA already provides an adequate channel for judicial review, and their attempt to enforce Executive Order 13186 must be dismissed because that Order is not subject to judicial review.

The Court may enjoin the Agency's registration of Rozol until it completes formal consultation with the FWS.  Thus, it may provide effective relief to the NRDC under the ESA, and thus, the NRDC's claim is not moot.  The NRDC is therefore entitled to a declaratory judgment that the Agency violated the ESA by registering Rozol without first consulting with the FWS.

The Court must determine whether a complete injunction of the use of Rozol pending the conclusion of the consultation process would be appropriate.  Although the Court concludes that it has the power to enjoin the Agency from authorizing all use of Rozol pending the fulfillment of its obligations under the ESA, several factors may caution against such a broad exercise of power.  LiphaTech voluntarily withdrew its local registrations in Colorado, Kansas, Nebraska, Oklahoma, Texas, and Wyoming as a condition of Agency registration.  Thus, an injunction would prevent LiphaTech from selling its Rozol anywhere -- even in a state like Kansas, where Rozol has been approved for use since 2004.  Moreover, Rozol is currently being sold and used in ten states in order to control the black-tailed prairie dog population.  The effects of an injunction on farmers and ranchers in these states are unclear.  What *is* clear is that total

injunction of Rozol's registration would not restore the parties to the status quo.  (*See* LiphaTech

Reply at 24.)  The Court will therefore hold a hearing to determine "what injunctive relief is

appropriate, if any," *Nat'l Wildlife Fed'n*, 402 F. Supp. 2d at 11, and will request input from the

parties before the hearing occurs.  A separate Order accompanies this Memorandum Opinion.


                                         _____/s/_____
                                         ELLEN SEGAL HUVELLE
                                         United States District Judge

Date:   June 14, 2011